**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

**MELISSA FIELDS**, as Personal
Representative of the Estate of
**MICHAEL A. NICHOLS**,

                **Plaintiff,**

v.                                                           Civil Action No. 2:22-cv-00426

**U.S. MARSHALS SERVICE**

                **Defendant.**

## COMPLAINT

Melissa Fields, as Personal Representative of the Estate of her father, Michael A. Nichols, deceased, for her Complaint against Defendant U.S. Marshals Service, states as follows:

## PARTIES

1. Plaintiff Melissa Fields is a resident and citizen of Wood County, West Virginia, and is the duly appointed and acting Personal Representative of the Estate of Michael A. Nichols (sometimes referred to herein as "Michael").

2. Defendant U.S. Marshals Service (sometimes referred to herein as "USMS") is a federal law enforcement agency that employed, at all times relevant herein, Michael P. King ("King") to engage in law enforcement duties in Southern West Virginia, and as such, Defendant USMS is liable for the negligent conduct, acts, and omissions of King, as well as for its own and its other employees' acts of negligence and other conduct, as described herein.  In at least one other matter, both King and the United States government have argued, and this Court has agreed, that King is a federal employee.

1

## JURISDICTION AND VENUE

3. Plaintiff's claims in this matter arise out of the entirely unnecessary shooting incident and horrific death of Michael A. Nichols. On October 22, 2020, at Michael's residence on Kettle Road in Roane County, West Virginia, Michael—unarmed on his own front porch—was tragically and fatally shot by King without justification.

4. This Court has original and subject matter jurisdiction over this matter pursuant to federal question jurisdiction, codified at 28 U.S.C. § 1331 and 1346(b), because Plaintiff asserts claims under the Federal Tort Claims Act against the U.S. Marshals Service, a federal law enforcement agency of the United States, which claims arose within this District.

5. Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because the causes of action arose in Roane County, West Virginia, and King resides there, a county within this Court's district and division.

6. On or about December 17, 2021, Plaintiff properly provided USMS with a Standard Form 95 in accordance with the requirements of the Federal Tort Claims Act. To date, USMS has failed to respond. As more than six months have elapsed, Plaintiff's Standard Form 95 is deemed denied such that all jurisdictional prerequisites have been met and this lawsuit may proceed.

## FACTS

*The Tragic Shooting of Michael Nichols*

7. On October 22, 2020, Michael Nichols was alone at his home at 2026 Kettle Road, on a gravel road in rural Roane County, West Virginia. Michael lived by himself in this private setting.

8. The home of his closest neighbors, Jimmy and Selena Parsons, is located approximately 200 yards away.

9. Mr. Parsons called King on King's cell phone while King was off duty about Michael's behavior during the day of October 22, 2020.

10. Prior to the shooting incident, the Parsons did not call 911, the Roane County Sheriff's office, or USMS to report any issues regarding Michael or otherwise, and instead spoke only privately to King on his cell phone.

11. At all times relevant to these events, according to King, he was working "full time" for the U.S. Marshals Service as a Fugitive Task Force Officer. While he was also employed by the Roane County Commission as a Sheriff's Deputy for Roane County, West Virginia, during the subject time frame he rarely performed any services for the Sheriff's Department and did not patrol the Roane County area as a deputy. Instead, King primarily (and, in some weeks or months, exclusively) performed services for the USMS such that USMS was his primary employer and provider of police work to be performed by King.

12. USMS provided King with most, if not all, of the equipment he needed to perform his law enforcement duties, including a vehicle, vest, and "all of [King's] gear."

13. King routinely dressed in his USMS tactical clothing and consistently wore a USMS vest such that West Virginia citizens, including Michael Nichols, would believe he was a USMS employee and acting on behalf of USMS. King never wore a Roane County Sheriff's Department issued uniform and did not drive a Sheriff's Department issued cruiser or other marked vehicle.

14. Without his employment arrangement with USMS and the equipment provided exclusively by USMS, King could not perform his job as a law enforcement officer generally, and could not have responded at all to any call from Mr. Parsons (or anyone else) on October 22, 2020, specifically. King's own sworn testimony confirms that he was a full-time employee of the USMS,

and as such his law enforcement actions on October 22, 2020 were taken under the authority of the USMS.

15. After speaking with Mr. Parsons on October 22, 2020, and without receiving any direction or order from the Roane County Sheriff's Department to respond to the Nichols' property, King went alone to Michael's residence in his USMS truck and, upon information and belief, wearing a vest and other gear provided by USMS. King did not wear a body-worn camera.

16. Upon information and belief and in violation of standard police procedure, King did not even stop to check on or interview the Parsons.

17. Instead, King—evidently believing he is unbound by the law or proper police procedures, and no doubt feeling empowered by his seemingly unrestrained and unchecked work on behalf of USMS—went straight to Michael's residence, alone.

18. Michael—a slight, older man who was unarmed and did not own any firearms—was simply sitting on a swing on his well-lit front porch when King arrived. As King pulled up, the large streetlight directly overhead would have made it easy to see that Michael presented no imposing threat to anyone. Michael certainly would not have been a threat to an armed deputy of King's significant stature who is supposedly trained in self-defense and hand-to-hand combat, and provides instruction regarding firearms.

19. According to King, he had been to Michael's residence multiple times in the past through his work searching for fugitives, was familiar with Michael, and Michael had never presented or otherwise imposed a threat of physical or other harm to King.

20. King had previously attempted to apprehend a fugitive on behalf of USMS at or near Michael's residence such that Michael would have believed that King was an employee of the USMS, and King was familiar with the residence.

21.	According to King, King stayed near his truck in the driveway when he arrived, and Michael was on the porch near the front door.  According to King, there was a supposed "lever action rifle" leaning on a railing across the porch from where Michael was located.  According to King, this alleged "weapon" was between King and Michael.  In actuality, this "weapon" was a BB gun that had been jammed under the porch railing for years.

22.	According to King, Michael let out a "warrior cry" and then "moved toward the gun".

23.	According to King, he then immediately shot Michael 3 times, twice in the body and once in the face.

24.	Even under King's version of events described above (which is disputed by Plaintiff and the physical evidence at the scene), King had zero justification for shooting Michael.  Under King's own version of events, Michael *never touched the supposed weapon*, let alone pointed it or otherwise made any threat of serious injury to King.  In fact, even under King's version (which is not true), the supposed weapon never moved and Michael was standing up by the front door—several feet away from the supposed weapon—when King killed him.

25.	Even a supposed "expert" witness retained on King's behalf suggested that Michael may have simply been responding to King's order to get on the ground when King killed him.

26.	In reality, the supposed "lever action rifle" was an old, rusted BB gun that was wedged under the porch railing—and affixed thereto as a railing spindle—as decoration.  It had been there for quite some time.

27.	King's version of events is untenable and unsupported by facts and evidence. Indeed, the location of the BB gun lodged vertically under the railing of the porch like a spindle, was obviously not a threat in the unlikely event it could have even been seen by King from his

5

position when he shot Michael. And even if King could see it, any trained law enforcement officer would recognize that the BB gun presented no threat. Among other things, there was zero possibility that Michael could even access this supposed "weapon" such that King would remotely (let alone, reasonably) have been in "fear" for his own life.

28. As referenced above, King had been to Michael's residence before, and upon information and belief, knew or should have known that the BB gun was just that—a non-threatening piece of decoration.

29. Of course, given King's well-known history of using excessive force throughout Roane County and West Virginia, which is described below, Michael never would have moved toward a BB gun to defend himself against King in the first place.

30. There was absolutely no physical struggle between King and Michael.

31. There was no body camera footage because King never wore such a camera, ever. Accordingly, King's various shootings and beatings of Roane County and West Virginia citizens, as described below, have repeatedly gone unrecorded.

32. The physical evidence and Plaintiff's investigation revealed that King's version of events is false, and that King was instead in very close proximity to Michael and shot him at close range on the porch at downward angles. Regardless, under King's own version, his shooting of Michael was entirely unjustified and Plaintiff is entitled to judgment against USMS for the acts of King as its employee and agent as set forth herein.

33. Even if Michael presented a threat to King in King's mind, which Michael absolutely did not and was physically incapable of doing, it would have been caused by King's utter failure to follow protocols and wholly unnecessary escalation of an alleged routine disturbance. Indeed, King habitually escalates routine, minor situations into physical altercations,

threatens use of deadly force, and on at least two occasions, as described herein, unjustifiably and improperly used deadly force. While he evidently believes it does, King's possession of a badge and employment with USMS does not permit him to routinely violate the rights of citizens, make unlawful orders, and then beat or shoot citizens if they raise questions or otherwise do not immediately comply with those unlawful orders.

34. From the beginning, King's entire approach to the situation involving Michael Nichols was wholly improper and in violation of commonly accepted law enforcement practices and procedures as well as Michael's rights.

***Prior Complaints and Lawsuits Regarding King's Misconduct and Use of Excessive Force***

35. Michael King has been employed as a Sheriff's deputy in Roane County for approximately 18 years. A few years into his career, King began working "part time" as a fugitive task force officer for the USMS. Under this arrangement, King would work primarily as a Sheriff's Deputy in Roane County, patrolling the area and otherwise performing the duties of a Sheriff's Deputy. He would work routinely for the USMS task force, serving warrants and accomplishing other law enforcement duties and responsibilities.

36. However, starting in 2019 approximately a year prior to Michael's death, King began working "full time" for USMS. According to King, though he also remained employed by the Roane County Commission as a Sheriff's Deputy, King rarely (if ever) performed the functions of a Sheriff's Deputy during the year or so prior to the subject encounter with Michael Nichols.

37. Instead, King worked primarily for the USMS. He was provided a vehicle and various equipment by the USMS, and routinely dressed in his USMS tactical gear. King stated that he would only participate in certain "bad" calls for the Sheriff's Department, and instead spent almost all of his law enforcement working hours dedicated to the USMS. Indeed, King testified

that even though the Roane County Commission would pay a portion of his hours worked, those hours were actually spent almost exclusively working on behalf of the USMS. As an example, if he worked 50 hours in a week, King testified that all of those hours would likely be spent working on behalf of USMS.

38. Upon information and belief, this arrangement whereby King started working exclusively for the USMS (and not providing services as a deputy in Roane County) arose *after* King's shooting of Timothy Rhodes in Roane County, which shooting was well-publicized and was the subject of a federal lawsuit in this Court as set forth in more detail below.

39. During his time working for USMS and his tenure in law enforcement generally, King has routinely shown an utter disregard for proper police procedures and has, on multiple occasions, used excessive and unnecessary force. Prior to the shooting of Michael Nichols, King had been the subject of multiple lawsuits for various instances of negligence, excessive force, and other claims. Upon information and belief, USMS knew of these various lawsuits and instances of excessive force on King's part *prior to* the shooting of Michael Nichols, and at a minimum absolutely should have known about these prior instances involving USMS's own employee and agent.

40. Aside from these lawsuits, the Sheriff of Roane County and the Roane County Commission received a host of oral and written complaints about King's dangerous behavior, recurrent failure to follow protocols, and frequent use of excessive force. Any reasonable investigation by USMS would have revealed these many concerning complaints.

41. USMS had a duty to Michael Nichols and the public to ensure that its officers, including King, were adequately trained, followed procedures, and otherwise would act in accordance with law enforcement protocols. Prior to the death of Michael Nichols, USMS knew

or should have known that King was routinely not following proper protocol regarding use of force and threats of lethal force during his encounters with myriad West Virginia citizens.

42. USMS failed to address any of the chronic issues and problems exhibited by King, and instead knowingly permitted him to continue working for the USMS and thus perpetuated and condoned his use of excessive force and improper police tactics.

43. The failures of USMS, as explained in detail herein, directly and proximately resulted in the foreseeable—and entirely preventable—death of Michael A. Nichols.

44. The complaints against King prior to his shooting of Michael, which included phone calls, informal and formal written complaints, and various lawsuits, are extensive.

45. In one complaint, in the autumn of 2018, Sheriff Cole was specifically advised by a man that King had unnecessarily pulled his weapon and struck the man's son with the end of a shotgun barrel while King was making an arrest. The man asked why Sheriff Cole was letting King pull his weapon and threaten people all over the county without justification. Sheriff Cole told the man that he would "take care of it."

46. A proper investigation would have revealed King's improper conduct, including hospital records and photographs concerning the laceration on the man's son's forehead from where King forcefully placed his weapon against the individual's head and struck him. Sheriff Cole did not take any corrective action with respect to King, and USMS did not investigate this complaint.

47. Also prior to the shooting of Michael, a woman called 911 in 2014 to report that King was—for no lawful purpose—commanding her to leave the premises of Walton Middle School where her child was attending a dance.

48.     In her call to 911, the mother relates that King had his hand on his gun, that he was commanding that she leave school property, and that he was physically preventing her from obeying the unlawful command that he was yelling at her.

49.     In her subsequent written complaint to the Roane County Sheriff's Department, the mother relates that she was scared and King's actions towards her made her feel unsafe.

50.     Notably, this was not the first formally documented incident involving King's practice of threatening and intimidating a law-abiding citizen without lawful authority, with no probable cause to either detain or arrest the individual, and with zero connection to any law-enforcement purpose.

51.     On or about December 1, 2016, after King applied to re-join the department after his employment had been terminated months earlier, a Roane County citizen called the Roane County Commission to make a complaint and share his views that King should not be re-hired by the Department due to King's prior use of excessive force against him.

52.     Per the Roane County Commission's instructions, this man then attempted to call the Sheriff's Department directly, but was transferred to the 911 center. He proceeded to make a complaint regarding King's prior use of excessive force against him in the past.

53.     Shortly thereafter, King arrived at the man's home with two other officers, and the group—led by King—severely beat the man in his yard while the man's wife and child begged them to stop. King then charged the man—who had called to make a complaint about King—with a crime.

54.     In addition to the above complaints and various others, King was a defendant in at least two federal lawsuits relating to King's use of excessive force. *See, Travis Rhodes, as Personal Representative of the Estate of Timothy E. Rhodes v. Deputy Sheriff Michael King, and the Roane*

*County Commission*, Civil Action No. 2:19-cv-00626 (S.D.W. Va.); *Brad E. Proctor v. Roane County Commission d/b/a Roane County Sheriff's Department, M.P. King, et. al*, Civil Action No. 2:19-cv-00432 (S.D.W. Va.).

55. In one case, Brad Proctor alleged that King and other officers forcibly entered Mr. Proctor's home—eight days after Mr. Proctor allegedly evaded arrest by King—and proceeded to beat, stomp, kick and punch Mr. Proctor while he lay prone on the ground. Mr. Proctor further claimed that King, along with other officers, then handcuffed him and left him in the snow, without a shirt, for over an hour. Mr. Proctor asserted a deprivation of his rights under 42 U.S.C. § 1983 against King (along with the other involved officers) and Roane County Commission, among other claims.

56. In another case that eerily foreshadows the exact conduct complained of herein, King and the Roane County Commission were defendants in a lawsuit filed by undersigned counsel on behalf of the Estate of Timothy Rhodes. In that case, King responded to a harmless 911 call about Timmy Rhodes spinning his truck tires on his own property. In a deeply disturbing manner, King utterly failed follow myriad proper police procedures and protocols, and ultimately shot Timmy Rhodes in the face with a 12-gauge shotgun while Timmy was lying on his back on his own property and while his fiancé watched in horror. The details of that horrific event are set forth in the Amended Complaint filed by estate representative Travis Rhodes. *Supra, Rhodes v. Deputy Sheriff King, et. al*. (ECF No. 4).

57. The allegations in the Timmy Rhodes case alone unequivocally put USMS on notice of King's misconduct and, among other things, his propensity to improperly use excessive and unlawful lethal force.

58.     In light of this extended series of deeply disturbing behaviors on King's part, his routine failure to follow any modicum of proper police procedures when responding to minor disturbances, various complaints made by numerous citizens of Roane County and elsewhere, and multiple federal lawsuits, USMS knew, or with any modicum of care should have known, of King's propensity to disregard proper procedure and protocols in performance of his duties, and to use excessive force.

59.     USMS failed to address any of these significant problems, and instead permitted King to continue on his dangerous path unfettered.

60.     Upon information and belief, the USMS did **nothing** to attempt to correct, much less address, King's dangerous behavior in any way.  Instead, USMS stood idly by, and in turn encouraged King's use of excessive force and utter disregard for proper police procedures, as well as a disregard for the safety and welfare of the citizens of Roane County and West Virginia, including Michael Nichols.  Tragically, Michael died as a direct and proximate result of USMS's negligence in retaining King and utter failure to supervise or train him despite the numerous events described herein.

*King's Acts and Omissions relating to Michael Nichols*

61.     King's wholly improper conduct and deviations from commonly accepted policies and procedures of law enforcement include, without limitation, the following:

   a. Receiving the call from Mr. Nichols' neighbor directly to his cell phone and responding alone;

   b. Failing to fully obtain and/or verify relevant information prior to approaching Michael Nichols' residence;

  c. Failing to fully inform anyone of sufficient details regarding the situation at hand such that relevant individuals and emergency medical providers could respond in an appropriate and timely manner;

  d. Approaching the scene without his body camera;

  e. Unnecessarily escalating a non-violent situation;

  f. Increasing the likelihood of a misunderstanding, as well as increasing the likelihood of a lethal shooting through accident, misunderstanding, or impulse;

  g. Failing to use non-lethal procedures, to the extent the same were even warranted;

  h. Otherwise failing to follow proper police procedures by prematurely resorting to lethal force without first exhausting (or even trying to use) non-lethal procedures or options;

  i. Ultimately and unnecessarily shooting Michael Nichols' multiple times, either because of his negligence in committing the acts and omissions described herein and escalating the situation improperly, or because of his intentional use of unlawful, excessive and lethal force;

  j. Failing to promptly render aid;

  k. Failing to sufficiently notify first responders of his whereabouts and the shooting such that an ambulance and medical team could timely render aid to Michael Nichols; and

  l. Such other ways as discovery may reveal.

  62. As Plaintiff's investigation of this matter is ongoing, it is unclear whether King committed the above-described acts and omissions negligently or intentionally, or a combination of negligent and intentional acts. Accordingly, as set forth in more detail herein, Plaintiff expressly

asserts and preserves, as alternative claims, that King was negligent in his approach to the situation and ultimate shooting of Michael Nichols, and that King acted intentionally in committing the above-described acts and omissions and purposefully shot Michael, such that his conduct is imputed to USMS and imposes liability upon it.

63. King's acts and omissions as described above, whether negligent or intentional, proximately caused severe injuries, pain and suffering, and the ultimate death of Michael Nichols.

64. Furthermore, as a direct and proximate cause of USMS's failure to act with regard to King's past failures to follow established law enforcement procedures and protocols prohibiting the use and threatened use of such dangerous and excessive force during routine responses, interrogations and arrests, King was permitted to respond to an incident on Kettle Road on October 22, 2020, and permitted to again use unwarranted and unprovoked excessive force causing the death of Michael Nichols, an unarmed individual.

## COUNT I – FEDERAL TORT CLAIMS ACT: VICARIOUS LIABILTY AGAINST USMS

65. Plaintiff repeats and realleges the allegations contained in paragraphs 1-64 of this Complaint as if set forth fully herein.

66. King is an agent and employee of Defendant USMS. At all times referenced herein, King was acting within the scope of his agency or employment with Defendant USMS. King had actual authority to act as an officer on behalf of USMS as well as the apparent, inherent, and implied authority to act on behalf of USMS during the relevant timeframe.

67. Indeed, King stated that, during the relevant time period at issue in this Complaint, he was working "full-time" with the USMS, and that USMS provided him "all my gear" and a USMS vehicle equipped with various weapons, including firearms, and other equipment that

enabled King to do his job as a federal law enforcement officer. Without this equipment, King could not have responded to (let alone shot) Michael Nichols on the subject evening.

68. King attempted to contact at least one other USMS task force officer prior to responding to Michael's home.

69. Accordingly, and for other reasons discovery may reveal, Defendant USMS is strictly and vicariously liable for the acts of King pursuant to 28 U.S.C. § 2671 *et seq.* as referenced by the above facts and allegations in this Complaint.

70. The negligence of King outlined in this Complaint, including without limitation the acts and omissions described in subparts a through l of Paragraph 61 herein, wrought by his myriad failures to follow basic police procedure, including but not limited to his failure to utilize the 911 system for a proper response to the scene, failure to obtain and verify information prior to approaching Nichols' residence, unnecessary escalation of the situation, failure to use non-lethal procedures, premature use of lethal force, failure to render aid and failure to notify first responders of his location is imputed to USMS pursuant to 28 U.S.C. § 2671 *et seq*.

### COUNT II– FEDERAL TORT CLAIMS ACT: NEGLIGENCE AGAINST USMS

71. Plaintiff repeats and realleges the allegations contained in paragraphs 1-70 of this Complaint as if set forth fully herein.

72. Defendant USMS (independent of its vicarious liability for the conduct of King), was separately negligent in several additional respects, including but not limited to the following acts:

   a. Failing to properly train King in proper police procedures and response procedures;

   b. Failing to properly monitor and supervise King;

15

    c. Providing King with equipment, including a truck (which as described by King was a mobile armory) and other equipment, without which he would not have been able to respond to the subject call or otherwise appear at Michael Nichols' home;

    d. Encouraging King's use of excessive force;

    e. Negligently retaining King and keeping King employed despite the numerous warnings and prior events placing USMS on notice of King's improper conduct and propensity to use unlawful, unwarranted, and excessive force;

    f. Failing to investigate King's multiple citizen complaints and federal lawsuits about King's pattern of use of excessive force and failing to take remedial action with regard to the complaints;

    g. Condoning, encouraging, and demonstrating indifference to the use of excessive force by King;

    h. Failing to investigate, in any meaningful way, if at all, King's shooting of Timmy Rhodes; and

    h. Such other ways as discovery may reveal.

73. Any reasonable and reasonably well-trained law enforcement supervisor would recognize that failing to take action to correct, discipline, or remove King based on the proven and alleged dangerous misconduct involving the unnecessary use of force and unnecessary threats of lethal force by King that occurred prior to Michael Nichols' shooting—and of which USMS had actual knowledge or otherwise should have known—was likely to enable and encourage King in his excessive use of force and his continued and excessive threats of the use of non-lethal force, and would again result in the unnecessary and unconstitutional killing of a citizen in violation of clearly established laws and constitutional provisions.

74. Any reasonable and reasonably well-trained law enforcement supervisor would recognize that failing to take action to correct, discipline, or remove King based on the proven and alleged dangerous misconduct involving the unnecessary use of force and unnecessary threats of lethal force by King that occurred prior to the Michael Nichols shooting— and of which USMS had actual knowledge or otherwise should have known—was itself negligent.

75. Shockingly, prior to the killing of Michael Nichols, Timmy Rhodes was shot in the face and killed while lying on his back, unarmed, on his own property, as a proximate result of King's wholly improper conduct.  King and other defendants were the subject of another federal lawsuit over King's disturbing behavior, of which USMS and the Department of Justice had actual knowledge, or at least absolutely should have known and investigated prior to Michael's death.  Yet, upon information and belief, they did **nothing,** and King again was permitted to shoot another Roane County citizen in the face on his own property.  More direct foreshadowing and warning could not exist, making the tragic death of Michael Nichols, entirely foreseeable (and thereby preventable) by his superiors at USMS.

76. USMS's negligence described above, including its failures to address the numerous complaints regarding King's conduct; failure to discipline King; failure to train King; failure to follow proper procedures and protocols; failure to remove King from the USMS or otherwise address his disturbing behavior; and otherwise encouraging, either through affirmative conduct or silence, King's improper conduct, imposes liability directly upon USMS for the damages set forth herein.

77. Defendant USMS is liable for its own negligent retention and supervision of King as set forth above.

78. The negligence of King and USMS and the acts and omissions set forth herein proximately caused severe injuries, pain and suffering, emotional distress, and ultimate death of Michael Nichols, along with all other damages identified in this Complaint.

## PRAYER FOR RELIEF AND DEMAND FOR JURY TRIAL

**WHEREFORE**, the conduct described herein of the Defendant served as the direct and proximate cause of the death of Michael A. Nichols. Therefore, Plaintiff demands judgment against the Defendant for all recoverable damages, including without limitation those damages permitted and set forth pursuant to the West Virginia Wrongful Death Act, W. Va. Code § 55-7-5 and § 55-7-6, and all damages available under the FTCA, 28 U.S.C. § 2671, *et seq*., including but not limited to:

    a. Damages in compensation for sorrow, mental anguish and solace which may include society, companionship, comfort, guidance, kindly office and advice of the decedent;

    b. Damages in compensation for the reasonably expected loss of (i) income of the decedent, and (ii) services, protection, care and assistance provided by the decedent;

    c. Damages in compensation for pain and suffering prior to death;

    d. Damages in compensation for loss of enjoyment of life;

    e. Expenses for the care, treatment and emergency response personnel incident to the shooting death of the decedent;

    f. Reasonable funeral expenses;

    g. Post-judgment interest;

    h. Attorney fees and costs; and

    i. Such other and further relief as may seem fair and just.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES.**

        **MELISSA FIELDS**, as Personal Representative of the Estate of **MICHAEL A. NICHOLS**,

        By counsel

        */s/ R. Booth Goodwin II*
        R. Booth Goodwin II, Esq. (WVSB #7165)
        Benjamin B. Ware, Esq. (WVSB #10008)
        Stephanie H. Daly, Esq. (WVSB #8835)
        Goodwin & Goodwin, LLP
        300 Summers Street, Suite 1500
        Charleston, West Virginia 25301
        (304) 346-7000/(304) 344-9692
        rbg@goodwingoodwin.com
        bbw@goodwingoodwin.com
        shd@goodwingoodwin.com

        and

        L. Dante' diTrapano, Esq. (WVSB #6778)
        Calwell Luce diTrapano PLLC
        500 Randolph Street
        Charleston, West Virginia 25302
        (304) 400-6558/(304) 344-3684
        dditrapano@cldlaw.com